**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

UNITED STATES OF AMERICA        :

                                :

        v.                      :

                                : Crim. No. 3:94-cr-00112 (AWT)

MANUEL E. ROMAN                 :


**ORDER DENYING RENEWED MOTION FOR SENTENCE REDUCTION**
**UNDER THE FIRST STEP ACT**

Defendant Manuel E. Roman has moved for a sentence reduction under Section 404 of the First Step Act, based on application of the Fair Sentencing Act of 2010, and Section 603 of the First Step Act, commonly referred to as "compassionate release." For the reasons set forth below, his Renewed Motion for Sentence Reduction Under the First Step Act ("Renewed Motion") (ECF No. 2323) is hereby DENIED.

**I**

On May 3, 1995, the defendant, along with 19 co-defendants, was charged in a Second Superseding Indictment for offenses related to drug trafficking, violence and murder in Connecticut. Roman was charged as follows:

Count 1: RICO in violation of 18 U.S.C. § 1962(c).

Count 2: RICO Conspiracy in violation of 18 U.S.C. § 1962(d).

Count 10: VCAR in violation of 18 U.S.C.§ 1959(a)(5) –
Conspiracy to murder Charles Robinson.

Count 11: VCAR in violation of 18 U.S.C.§ 1959(a)(1) –
Murder of Charles Robinson.

Count 19: VCAR in violation of 18 U.S.C. § 1959(a)(5) –
Conspiracy to murder Victor Mojica.

Count 22: VCAR in violation of 18 U.S.C. § 1959(a)(6) –
Conspiracy to assault "Green Eyed Tito."

Count 27: Conspiracy in violation of 18 U.S.C. §§ 846 and
841(a)(1) – Conspiracy to distribute heroin, marihuana, and
cocaine and cocaine base.

Count 29: Possession of a Firearm by a Convicted Felon in
violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

The defendant was charged with the following four predicate
racketeering acts ("RAs") underlying Counts 1 and 2:

RA 1: Conspiracy to Distribute Narcotics.

RA 8-a: Conspiracy to Murder Charles Robinson

RA 8-b: Murder of Charles Robinson

RA 11: Conspiracy to Murder Victor Mojica

At trial the government presented evidence regarding the
Latin Kings, their history and organization, and their
leadership structure in Connecticut.  Nelson Millet was the
Supreme Crown President and led the Latin Kings nationwide from
1991 to 1994.  Despite being incarcerated, Millet maintained
communication with the leadership of the Latin Kings in
Connecticut by phone and mail.  Defendant Roman was the leader

of the Latin Kings in Connecticut and served as "Supreme Crown Chairman."  Presentence Report ("PSR") (ECF No. 2133-3) ¶ 9.

As described in the PSR, extensive evidence was presented concerning the defendant's drug trafficking activities from 1991 through 1994. See id. ¶¶ 32-43. The defendant sold drugs in East Main Street in Bridgeport and "as [he] rose to become the highest-ranking member of the Latin Kings in Connecticut" his trafficking operation grew as well. Id. ¶ 33. In addition to overseeing drug distribution in the Bridgeport area, the defendant also supplied Latin Kings in New Haven with drugs. Id. ¶¶ 35-36.

Evidence at trial also demonstrated the defendant was responsible for the murder of Charles Robinson. Id. ¶[¶] 48-53. Robinson, who was riding his bicycle when he was killed, suffered gunshot wounds to the head, neck, chest, hands and legs. Id. ¶ 48. One witness explained the motive for the murder – Robinson was selling crack in the defendant's territory. See id. ¶ 51.  According to the witness, the defendant directed three other Latin Kings to kill Robinson, supplied them with the weapons, and told them to attack him from two different directions so he could not escape. Id. ¶ 52. After the murder, the three other Latin Kings returned to the defendant's apartment and returned the guns to him. Id. ¶ 53. The location of the various shell casings indicated that the gunmen shot Robinson from two different directions, corroborating the witness's testimony. Id. ¶ 50.

The evidence at trial also demonstrated that the defendant conspired to kill Victor Mojica.  Id. ¶[¶] 54-64. Mojica and his brother were Latin Kings who had a dispute with other members of the Latin Kings. The defendant was called upon to mediate the dispute. See id. ¶ 54. Ultimately, the defendant signed an order expelling Mojica purportedly for missing meetings. Id. ¶ 56. In fact, this was a pretext. Id. ¶ 55. The real reason the defendant expelled Mojica was to kill him; it was against the Latin Kings' charter for one member to kill another. Id. The expulsion order was dated December 6, 1992. Later in the spring of 1993, the defendant or his co-defendant gave the "green light" to do a "mission" against Mojica – a drive-by shooting. Id. ¶ 58. The defendant selected Luis Rodriguez, aka "Psycho," armed him, and gave him instructions on where to go and what to do. Id. ¶ 59. The defendant provided a

stolen car that was used in the shooting. Id. ¶[¶] 60-61.
Afterwards the defendant instructed others to burn the
stolen car. *Id.* Three individuals were injured as a result
of the drive-by shooting – Mojica's eight-year-old son, a
12-year-old girl, and an 18-year-old boy. Id. ¶ 63.

The evidence also demonstrated that the defendant was
involved with the planning and execution of a plan to
assault an individual known as "Green Eyed Tito." Id. ¶[¶]
65-68.

Finally, law enforcement executed a search warrant at
the defendant's residence, and agents recovered a loaded
9mm pistol with a bullet in the chamber. Id. ¶[¶] 44-45.
The defendant acknowledged it was his and told agents that
he could have "blown their shit away." Id. ¶ 45. The
defendant stipulated at trial that he had a prior felony
drug conviction. Id.

Gov't's Opp'n (ECF No. 2356) at 3-5.

At trial the defendant was convicted on all of the charges

against him, and the jury found that each RA had been proven.

The maximum penalties for the offenses of conviction were as

follows:

Count 1 carried a maximum penalty of life given the
applicable RA.

Count 2 carried a maximum penalty of life given the
applicable RA.

Count 11 carried a maximum penalty of life.

Counts 10, 19, 22 and 29 each carried a maximum penalty of
10 years.

Count 29 carried a maximum penalty of life (with a
mandatory minimum penalty of 10 years).

The PSR calculated the defendant's Guidelines range, which

Judge Nevas adopted over the objection of defense counsel.  To

calculate the Guidelines range, the eight counts of conviction were broken into four groups of related counts, as follows:

Group 1 (Count 1 (RA 1), Count 2 (RA 1), Count 27 and Count 29) – Drug Conspiracy and Possession of a Firearm by a Convicted Felon.

Group 2 (Count 1 (RAs 8a and 8b), Count 2 (RAs 8a and 8b), Count 10 and Count 11) – Conspiracy to Murder and Murder of Charles Robinson.

Group 3 (Count 22) – Conspiracy to Assault Green Eyed Tito.

Group 4 (Count 1 (RA 11), Count 2 (RA 11) and Count 19) – Conspiracy to Murder Victor Mojica.

See PSR ¶ 72.  Based on this grouping, the total offense level was calculated as follows:

The adjusted offense level for Group 1 was 44. Id. ¶ 81. In calculating this level, the PSR found that "the evidence indicate[d] that the defendant was responsible for the distribution of far more than 1.5 kilograms of cocaine base." Id. ¶ 76. The adjusted offense level for Group 2 was 45. Id. ¶ 87. The adjusted offense level for Group 3 was 30. Id. ¶ 93. The adjusted offense level for Group 4 was 32. Id. ¶ 99.

After determining the offense level for each group, the PSR then combined the offense level[s] pursuant to U.S.S.G § 3D1.4. Id. ¶[¶] 100–107. One unit was assigned for Group 2 because it had the highest offense level. See ¶ 101. Another unit was assigned for Group 1 because its offense level was only one level less than Group 2. See id. No units were added for either Group 3 or Group 4. Id. As a result, the PSR calculated the total number of units at 2. Id. ¶ 102. The resulting adjusted offense level was therefore 2 more than the highest group offense level, resulting in a total offense level of 47. Id. ¶¶ 103–107. The total offense level was then treated as an offense level of 43 per the Sentencing Guidelines. Id. ¶ 127. To be clear: that is two levels lower than the highest offense level of 45, which the PSR found for Group 2 – the murder group – alone.

5

Gov't's Opp'n at 6.

The defendant's criminal history category was III so the applicable Guidelines range was life, which would have been the applicable Guidelines range even if he had been in Criminal History Category I.

On January 23, 1996, Judge Nevas sentenced the defendant to life imprisonment on Counts 1, 2 and 11, and to 10 years' imprisonment on each of Counts 10, 19, 22, 27 and 29, all imposed to run concurrently.  The defendant is serving his sentence at a high security penitentiary, USP Coleman II.

## II

Under Section 404 of the First Step Act, "[a] court that imposed a sentence for a covered offense may, on motion of the defendant, the Director of the Bureau of Prisons, the attorney for the Government, or the court, impose a reduced sentence as if sections 2 and 3 of the Fair Sentencing Act of 2010 . . . were in effect at the time the covered offense was committed." First Step Act of 2018, Pub. L. No. 115-391, § 404(b), 132 Stat. at 5222.

Also, the First Step Act amended, inter alia, Section 3582(c)(1)(A) of Title 18 of the United States Code.  That provision requires as an initial matter that

the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a

motion on the defendant's behalf or the lapse of 30 days
from the receipt of such a request by the warden of the
defendant's facility, whichever is earlier . . . .

18 U.S.C. § 3582(c)(1)(A).  Assuming a defendant has exhausted

administrative remedies, a court may reduce a term of

imprisonment under Section 3582(c)(1)(A)(i) if, after

considering the factors set forth in 18 U.S.C. § 3553(a) to the

extent they are applicable, the court finds that "extraordinary

and compelling reasons warrant such a reduction" and "that such

a reduction is consistent with applicable policy statements

issued by the Sentencing Commission".  18 U.S.C. §

3582(c)(1)(A)(i).  In making this determination courts should

"consider the full slate of extraordinary and compelling reasons

that an imprisoned person might bring before them in motions for

compassionate release.  Neither Application Note 1(D), nor

anything else in the now-outdated version of Guidelines §

1B1.13, limits the district court's discretion."  United States

v. Brooker, 976 F.3d 228, 237 (2d Cir. 2020).

     Roman has satisfied the requirement with respect to

exhaustion of administrative remedies.

                            **III**

     With respect to Section 404, the defendant does not contend

that any of Counts 10, 11, 19, 22 and 29 is a covered offense.

With respect to Count 27, the court previously determined that

while the offense is a covered offense, the defendant is

                              7

ineligible for relief under the Fair Sentencing Act because he had already served his sentence on Count 27.  See Order re Motion for Sentence Reduction Under the First Step Act (ECF No. 2159).

As to Count 1 (RICO) and Count 2 (RICO Conspiracy), there is a split of authority as to whether RICO counts such as those in this case are "covered offenses".  As noted above, there were four predicate acts underlying each of Count 1 and Count 2, one of which was RA 1 – Conspiracy to Distribute Narcotics.  In United States v. Allen, No. 3:03CR394 (DJN), 2022 WL 2124495 (E.D. Va. June 13, 2022), aff'd sub nom. United States v. Allen, No. 22-6746, 2023 WL 3050985, the court analyzed "whether Defendant's conviction for a RICO conspiracy, in violation of 18 U.S.C. § 1962(d), constitutes a covered offense under the First Step Act."  Allen, 2022 WL 2124495, at *5.  One of the underlying predicates in that case involved the distribution of crack cocaine.  The court concluded that the RICO count was not a covered offense.  It stated:

> [T]he Fair Sentencing Act did not change the statutory penalty range for an aggravated RICO conspiracy.  That a covered offense could have formed the predicate for the fourth element does not change the analysis.
>
> . . . .
>
> To the extent that drug offenses form the predicate of a RICO conspiracy, the RICO charge does not "turn on the punishment" for the drug offenses. Rather, the RICO charge turns on the conduct underlying the drug offenses — the

commission of a drug offense. . . . The element that
includes the racketeering activity does not turn on the
type or quantity of drug like the elements of the drug
offenses do. Instead, 18 U.S.C. § 1963 controls the
punishment, not 21 U.S.C. § 841(b). And, although the Fair
Sentencing Act modified the statutory penalties for 21
U.S.C. § 841(b), it left the statutory penalties for 18
U.S.C. § 1963 unaltered.

Id. at *8.  See also United States v. Randolph, No. 3:01CR304-

11, 2022 WL 17170850 (E.D. Va. Nov. 22, 2022).

In United States v. Sumler, No. 95-154-2 (BAH), 2021 WL

6134594 (D.D.C. Dec. 28, 2021), the court reached the opposite

conclusion, following the reasoning in United States v. Reed, 7

F.4th 105 (2d Cir. 2021).  The court stated:

Thus, the fact that defendant would have been subject to
life imprisonment on the RICO conspiracy offense—regardless
of any changes implemented by the Fair Sentencing Act and
even absent the predicate crack offenses—because of the CCE
murder conviction, has no bearing on the determination of
whether the conspiracy offense is "covered" within the
meaning of Section 404(a). As the Second Circuit explained
in Reed, "eligibility should be determined by utilizing a
categorical approach based upon the statutory penalties for
the offense of conviction, rather than the nature of the
offense conduct in a particular case." 7 F.4th at 112
(discussing Terry, 141 S. Ct. at 1863–64). When one object
of a conspiracy triggers the "covered offense" definition
of the First Step Act, "the statutory text in Section 404
does not require for eligibility any further inquiry
regarding any other statutory penalties implicated on that
count due to the other objects of the multi-object
conspiracy offense." Id. at 113.

Sumler, 2021 WL 6134594, at *12.

While United States v. Reed is not directly on point
because none of the counts at issue here involve a multi-object
conspiracy, the court finds helpful the analysis in the
concurring opinion.  In the concurring opinion, Judge Lynch
concluded that, in the case of a conspiracy where one of the
objects of the conspiracy is possession with intent to
distribute and distribution of crack cocaine, the analysis of
the statute which leads to the conclusion that the conviction
for conspiracy is not a "covered offense" "more closely follows
the literal meaning of the statute." Reed, 7 F.4th at 119. But
he further concluded that

> at a minimum, the language of the First Step Act is
> sufficiently susceptible of a more generous reading to be
> characterized as ambiguous, and in such situations the rule
> of lenity counsels adopting the interpretation that favors
> liberty. United States v. Plaza Health Lab'ys, Inc., 3 F.3d
> 643, 649 (2d Cir. 1993) (citing Crandon v. United States,
> 494 U.S. 152, 168, 110 S. Ct. 997, 108 L. Ed.2d 132
> (1990)).

Reed, 7 F.4th at 119.  That approach is equally applicable to
Count 1 and Count 2 here because one of the underlying predicate
racketeering acts is conspiracy to distribute narcotics.  Thus,
the court concludes that Count 1 and Count 2 are covered
offenses.

However, the fact that Count 1 and Count 2 are covered
offenses does not give the court authority to resentence the
defendant on Count 11, the VCAR murder of Charles Robinson, an

offense for which the defendant received a life sentence. Moreover, even if the court had such authority, it would not reduce the defendant's sentence on any of Counts 1, 2 or 11 because, for the reasons discussed below, the Section 3553(a) factors weigh decisively against a sentence reduction in this case.

In addition, with respect to compassionate release, the court concludes that, even assuming arguendo that Roman can establish extraordinary and compelling reasons, the Section 3553(a) factors also weigh decisively against a sentence reduction on that basis.

The defendant argues that there are a number of reasons why his sentence should be reduced, as follows:

. . . (b) an error was made at his first sentencing at which it was wrongfully presumed that he faced a statutory mandatory minimum sentence of life on Count [11], which was a clear ex post facto violation; (c) although the U.S. Sentencing Guidelines call for life imprisonment, this does not limit eligibility for the imposition of a reduced sentence, and, in fact, many courts have reduced life sentences to a term of years in First Step Act cases; (d) the Court now has mitigation evidence before it that was not presented at Mr. Roman's sentencing hearing in 1996; (e) the impact of the Second Circuit decision of United States v. Brooker, 976 F.3d 228, 2020 U.S. App. LEXIS 30605, at *22 (2020), which held that the First Step Act speaks of sentence reductions and included "the injustice of [the defendant's] lengthy sentence" in the context of the present coronavirus pandemic as itself an extraordinary and compelling reason for a sentence reduction; (f) Mr. Roman's low risk of recidivism, extraordinary rehabilitation in the Bureau of Prisons, and family and community support; and (g) Mr. Roman's hypertension, his contraction of Covid-19, the risk of reinfection presented

> by Covid-19, and the more severe conditions of confinement
> due to the pandemic have made Mr. Roman's incarceration
> harsher and more punitive than it otherwise would have
> been.

Renewed Motion at 1-2.  He notes that "[n]o court has ever
considered the full history and characteristics of Manuel E.
Roman; instead, the principal focus has been on his crimes."
Id. at 2.  He highlights the fact that "[a]t the time of his
sentencing, Mr. Roman was twenty-eight years old with one prior
felony conviction, a narcotics sale offense committed at age 21."
Id. at 4.

> In his letter in support of the instant motion, Roman writes:
>
> In no way do I intend to even attempt to shift blame from
> myself to another. At a young age I was drawn, drawn into a
> life of gang activity, dealing with drugs and firearms, and
> my actions ultimately were directly responsible for the
> death of Charles Robinson. I fully admit I am guilty and I
> do not have the words to say how sorry I am nor do I
> believe the words "I'm sorry" could ever ease the pain and
> suffering of a family losing a loved one violently.

Renewed Motion, Ex. 1 at 1.

The defendant states that "[t]he parties and the Court
erroneously believed that the statutory mandatory minimum was
life."  Renewed Motion at 8.  The government believes that
"[t]he record is simply not clear" as to whether the mandatory
sentence was driven by statute or the Sentencing Guidelines.
Gov't's Opp'n at 19.  The answer to this question is not
material to the court's analysis because the defendant is simply
"requesting that these factors be taken into account for the

first time," and the court is, in deciding the instant motion,
considering all of the arguments and supporting materials
submitted by the defendant.  Renewed Motion at 8.  Also, it is
clear that the fact that the Sentencing Guidelines call for life
imprisonment does not limit the defendant's eligibility for a
reduced sentence, and the government does not even appear to
suggest otherwise.

The defendant contends that there are a number of
extraordinary and compelling reasons supporting his motion,
including his "low risk of recidivism, extraordinary
rehabilitation in the Bureau of Prisons, and family and
community support."  Id. at 18.

With respect to rehabilitation, the defendant points to
"his record and accomplishments in prison, which include dozens
of educational courses, including the earning of his G.E.D.;
achievement of English proficiency in English as a Second
Language; training as a tutor; and religious and bible studies.
See Exhibit 2 (Inmate Educational Data Transcript, January 19,
2021); Exhibit 3 (certificates of achievement); and Exhibit 4
(certificates of completion for religious studies courses)." Id.
at 19.  His educational transcript reflects entries for at least
29 courses he has completed, and also reflects that he has taken
courses on a fairly regular basis with the exception of the
period between 2002 and 2010.  He has completed numerous

13

religious courses and bible studies.  He has submitted over 90
certificates of completion for religious studies courses, one of
which shows that he was baptized in 2006.  See Renewed Motion,
Ex. 4 (ECF No. 2323-1).  He has submitted a summary of his "road
to rehabilitation," which he writes

> began with my willingness to take advantage of the programs
> offered by the FBOP, participating in these programs,
> programs that are not mandatory.  I found myself displaying
> a new and much more positive attitude, through my faith in
> God and the pre-release programs I've taken and completed
> over the years of my incarceration . . . .

Renewed Motion, Ex. 5 (ECF No. 2323-1).  He writes about the
Cope Program, which is a 500-hour 9-month residential program; a
26-week spiritual program called the "Threshold Program"; and
his work as a tutor over a period of 5 years.  Id.

The defendant points out that he "has been consistently
employed while incarcerated" (Renewed Motion at 20), and that
"[i]n addition to his official work assignments, Mr. Roman has
also dedicated himself to mentoring other inmates."  Id. at 21.
Roman submits letters from other inmates: two individuals for
whom the defendant has been a mentor have submitted letters on
his behalf.  One writes that "Manuel has been a caring friend,
religious mentor and positive role model to me and so many
others."  Renewed Motion, Ex. 6 (ECF No. 2323-1).  The second
individual writes, "I learned how mighty God truly is with him,
by the changes in Manuel's life.  In the time I knew him nobody

14

could ever convince me he was the same person from the early 1990s, because he is not."  Renewed Motion, Ex. 7 (ECF No. 2323-1).

While in some instances, rehabilitative efforts by an inmate have been recognized by the Bureau of Prisons in the form of a transfer to a prison with a lower security level, that has not happened for Roman.

The defendant also points out that he has "maintained an almost-unblemished disciplinary record, having received only three disciplinary infractions during his decades-long incarceration," the last of which occurred in 2005.  Renewed Motion at 23.  Finally, family members have submitted letters of support, and those letters show that the defendant has significant family support and has in place a release plan.

The defendant points to all of the foregoing, together with his age and the fact that he is statistically unlikely to recidivate, as evidence that there is a low risk of recidivism in his case.

The defendant also argues that the fact that he suffers from medical conditions that are considered "COVID-19 risk factors by the" Center for Disease Control is an extraordinary and compelling circumstance.  Renewed Motion at 27. Specifically, Roman suffers from hypertension and has a body mass index that increases his risk of severe illness from COVID-

15

19.  In addition, he has actually contracted COVID-19 but recovered.

The court agrees with the government that the fact that the defendant suffers from medical conditions that are COVID-19 risk factors is not an extraordinary or compelling circumstance.  But the court does place weight on the defendant's progress in terms of rehabilitation, his family and community support, and his low risk of recidivism. After doing so, the court must still make the determination as to whether a sentence reduction is warranted "after considering the factors set forth in § 3553(a) to the extent they are applicable."  18 U.S.C. § 3582(c)(1)(A). Here the most significant Section 3553(a) factor is the purposes of sentencing, and the purpose of sentencing that should be given the greatest weight here is the need for the sentence imposed to reflect the seriousness of the offense.

In terms of the seriousness of the defendant's offense, his conduct speaks for itself. As the government emphasizes, quite properly, "[Roman] ordered at least two executions, one of which was successful and the other of which resulted in three children being serious[ly] injured."  Gov't's Opp'n at 26.  The defendant ordered the execution of Charles Robinson because Robinson was selling crack cocaine in the defendant's territory.  It is only a matter of luck that in this case Roman is only responsible for one death. The dominant driver in the calculation of the

16

applicable Guidelines range was Group 2, i.e. the charges for
Conspiracy to Murder and Murder of Charles Robinson.  Another
indication of the seriousness of the offense is the fact that
the applicable range would have been life imprisonment even if
the defendant had been in Criminal History Category I.

While the defendant asserts that since 1996, "there has
been a seismic paradigm shift in the way courts approach
sentencing as a result of Booker, and in particular, how they
approach sentencing in multidefendant conspiracy cases" (Renewed
Motion at 3), there has been no change with respect to the way
society views murder, i.e. an extremely serious offense, given
the impact on the victim and those who care about him.  The
defendant's sister writes about the impact of the lengthy
sentence the defendant is serving on him and his family:

> He has been in the federal prison system for over 20 years.
> That's 20 years of missed birthdays, Christmas, New Year's,
> births, deaths, happy moments as well as sad moments when
> we've needed each other.  I know he did wrong in the past
> but the person he is today deserves a chance.  A chance to
> be with his family.

Renewed Motion, Ex. 9 (ECF No. 2323-1).  While that is sobering,
it is also a reminder of the impact and potential impact of the
defendant's offenses on his victims and their families.

Consequently, the court concludes that Roman's significant
efforts in terms of rehabilitation and the other arguments
advanced by him in support of his request for a sentence

17

reduction are decisively outweighed by the need for the sentence in his case to reflect the seriousness of the offense.  In the court's view, the goal of having the sentence imposed reflect the seriousness of the offense would be seriously undermined by reducing Roman's sentence to a sentence of less than life imprisonment.

It is so ordered.

Signed this 5th day of December 2023 at Hartford, Connecticut.

/s/
_____
Alvin W. Thompson
United States District Judge
